1-3-26-32, Shemelia Burdett Foster v. Blue Cross Blue Shield of Michigan. Our next subject is 15 minutes per side. Ms. Thompson, will you help us? I'd like to, uh... Good morning, your honors. I'm Nicole Thompson here on behalf of the plaintiff appellate, Shemelia Burdett Foster. I'm assuming you're familiar with the briefs and the facts at this point. I may interject a few here and there in my legal argument. Did you reserve any time for rebuttal? I'm sorry? Did you reserve any time? Oh, my apologies. I would like to reserve three minutes for rebuttal, please. Thank you. All right. Well, in this case, my client has alleged, and appeals at this point, discrimination in violation of the ADA involving wrongful termination, hostile work environment, slash, harassment. And, let's see, in addition to that, retaliation. And the retaliation is an alternative claim for either retaliation due to a civil rights issue with regard to the racially charged remark and the retaliation thereafter by Farron Gibson or also to retaliation with regard to her claims under the ADA. Let me start by asking you, what accommodations did Ms. Burdett Foster request of her employer that they refused? I mean, was there some requests other than frequent bathroom trips? Yes. And later on, I know that she said she couldn't answer the telephone, but she didn't request an accommodation for that. No. Okay. No, and we don't claim that as a disability in this case. Okay. So what specific accommodations did she request that the employer refused? Well, two things. You discussed correctly that there was one regarding use of the bathroom related to some new medications she was taking after a disability leave. You could say it was accommodated to the extent that she could go to the bathroom when you wanted, but she had one of her supervisors basically stalking her not only every time she went to the bathroom, often standing outside the bathroom, and she referred to this as constant. He'd be standing outside the bathroom with his arms closed waiting for her to come out. He'd be peering through holes in the cubicle at her, around other people's cubicles at her, apparently listening in on her phone conversations. So the record is clear. You're not saying he was in the restroom peering over cubicles. My apologies. No, no, no. He was standing outside it. He would follow her there. He would follow her all around the building. Just a constant presence basically monitoring the use of this, which, and we don't disagree that monitoring that use might be appropriate. However, there would be a less harassing, less invasive way to do it, such as having a box that she checks for when she leaves and when she comes back, asking other employees, keeping track of whether her work is suffering in any way by some kind of productivity assessment. How long did he shadow her like that? How did he? How long? Oh, sorry. How long? My understanding is that it was from the time she got the accommodation, the medical note, until the time that she went on her next disability leave, if I remember correctly. Did she make a complaint to anyone else about this constant monitoring or stalking, as you refer to it? Yes. My understanding is she made a complaint to a supervisor, which she testified about at her deposition, and she claimed that nothing was done about it. Okay. So as far as the ADA claims, there hasn't been any dispute that my client's disabled. There's obviously no dispute that she was terminated. So that leaves us, again, with a causation issue, which I thought counsel that was up here arguing before handled very nicely. These are typically questions of fact. In this case, we have a number of items that could certainly be inferred or an inference could be drawn to demonstrate that there was pretext in the stated reason for termination. Do you really dispute, though, that she missed consecutive days of work, even if your argument is that it was three consecutive days versus seven consecutive days? If you missed three consecutive days of work without leave, why couldn't you be terminated? Let me clarify that. First of all, opposing counsel correctly pointed out there was a mistake in our brief regarding the two different return-to-work dates. That, indeed, took place late in the prior year of 2011. So that was just an honest mistake for which I apologize, but I don't think it affects our argument on this issue at any rate. I believe you were asking whether – sorry, I missed this. She did miss work, however. As in the past, what had been accepted was she would often, for her two prior disability leaves for depression, the psychologist would send a note first and then follow up. In one case, it wasn't even followed up by the psychiatrist until the date she was due to return from disability leave in order to confirm that what the psychologist had said was accurate, basically. Now, in this case, on the day that she was returned to work – actually, on the 17th, which may have been a day or two before. After another recent hospitalization, which included a suicide attempt, she received a note from her psychologist. Her psychiatrist was out of town. On the 17th, the psychologist faxed over a note indicating the doctor was out of town until the 19th. However, there were detailed notes also, which indicated that the client was undergoing severe stress at work and extreme depression, required an ongoing intensive program. And then that was followed up on the 19th. Are you saying that because in the past they'd allowed her to submit notes that really didn't qualify as valid excuses, that somehow the employers have stopped from ever insisting on a valid excuse? Well, I think that on the 19th, they did receive a valid excuse. We have in our records – You said don't recommend return to work, right? It didn't say why, and it wasn't a doctor? No, that's what I'm saying. On the 17th, there was an indication and a fax that they confirmed receiving from the psychologist. A work excuse – That was the counselor, right? Yeah, it was the counselor, whose advice they'd previously accepted even up to the point of the end of the disability term. Okay. That goes back to my question. Because the rules say it has to be a valid note from a doctor, correct? So you're saying that because in the past they had allowed her to skirt that rule, that they're stopped from imposing the rule at a later point in time? It would certainly be unfair and prejudicial to plaintiffs, especially considering the fact that she was in a severe depressive state at that point, in January there, where, like I said, there was a suicide attempt, and her counselor indicated that in no way, shape, or form, she should return to work, which was backed up by the work excuse that was signed by Dr. Abbasi on January 19, 2012. The problem is because we weren't able to – Wait, wait, I'm really confused. The therapist sends something on the 17th, right? And says, we have a problem here, doctor's returning in two days, I'll send you something then. But nothing happens, right? Was anything sent on the 19th? As far as the doctor's work excuse on the 19th, we have, I have actually right in front of me the work excuse. The only issue, I think, that came up in depositions was whether or not HR claimed that they received a copy of this. But it's titled work excuse, it certifies Shamelia Burdett Foster is under his care and is not able to work from January 17, 2012 through February 14, 2012. And that was sent? As far as we know, yes, it was sent. It was in the records that we received from Advanced Counseling Services, a copy of which was also received by a defendant. But I would have had to be able to depose the individual at Comp 1, Mary Kay Mitchell, to confirm receipt because any medical leaves went through her first. And not to get into that whole issue, but we had a real problem getting in touch with her. She had left her job. I won't go into that right now if you don't want me to. So that's part of the issue why I, unfortunately, don't have an exact explanation for whether or not they received it. But clearly the doctor wrote it, and it would have been the doctor that would have faxed it to Mary Kay Mitchell per their standard practice and procedures. Doesn't that make all the difference? They claim they fired her because nothing happened after the 17th, right? She just didn't show up, and that was it. Okay. And you're saying that that's not correct? Correct. Or you're saying it doesn't matter? Which is it? Oh, it matters. I think it matters a great deal. I think, though, that because the individuals that we deposed, as far as defendants' employees go, I believe they testified, if I'm remembering correctly, that they did not recall receiving this work excuse. What I'm saying is this work excuse would have gone to Mary Kay Mitchell at Comp 1, on the individual whose deposition we were seeking at the time that the motion for summary was filed. You're saying that you need an opportunity to do or that you've somehow been limited in your ability to conduct discovery, which prevents you from being able to provide a more detailed answer to Judge White's question. Correct. Correct. I apologize. Didn't that come up before the judge? I did raise in our brief that we – You mean your summary judgment brief? Correct. Correct. In our brief here, I believe it's mentioned also, but without citation – You did not file a 5060 affidavit, did you? No, we did not file a 5060 affidavit. We did try to substantively comply with that rule. We gave reasons why we needed the discovery and the reasons why we were having problems getting it, basically. Did you submit an affidavit from the doctor saying that, in fact, he sent this note on the 18th? No. No, it just came from their verified records, Your Honor. But who's verified records? The Advanced Counseling Services. Did the court know that there was a genuine issue or that you asserted there was a genuine issue whether notice was sent on the 19th that she was disabled? Yes, I believe so. And that's because what? It would have been in our brief and or our statement of facts that accompanies the brief. Okay. Thank you. So, let's see. So we left off, I think, Mr. Wagenbach was following her around. In addition, after the racially charged remark by Farron Gibson, which happened first, he, per my client's testimony, which is supposed to be given credence at this point, physically attempted to assault her on two separate occasions. He got very involved with all these discussions in the e-mails that were exhibits in the lower court and discussed in our briefs. You know, well, should we do this with Shamelia? Should we do that? I believe even after he wasn't her direct supervisor, he was still getting involved in e-mails about her medical thing and wanted to monitor the bathroom breaks and everything else. And like I said, that would be fine, but they were already working from some assumption that she wasn't going to be able to. It appeared, or they could be read, and the statements that they made could be read to agree with my client's interpretation that they were trying to shove her out the door from the moment that she complained of this statement by Mr. Gibson. And I think that that's further backed up by all the drama over the video stroboscopy. Now, the issue with the video stroboscopy, first and foremost, is that there are a lot of misstatements about why my client missed some appointments, et cetera, but I think that the crux of it is that my client's duties, she'd been working here since the year 2000. In 2011, I believe it was, there was a change over to Blue Cross Blue Shield rather than just Blue Care Network, if I'm remembering that correctly. So at that point, they wanted to add... Before you go through that history, with the videooscopy, she asserted a religious basis for her refusal to submit. And then she asserted a privacy interest in the religious reason for her unwillingness to discuss it with the employer. What is the basis, the legal basis that she can use for taking those two positions, one where she's claiming a religious basis, and then she's saying, but I don't have to tell you anything about my religious basis. Right. Well, the whole religious basis thing, let me put it in context first. This was after numerous attempts to obtain the code, which I'll get into details of in just a minute because we have very differing opinions on why the code was needed, and the request as to who was going to pay her doctor for the videostroboscopy. The point being, this drug on and on and on. She's frustrated at this point. They're calling her while she's on leave for depression, barely able to get out of bed. But the dragging on is primarily related to or caused by her, isn't it? I would disagree with that. So that's kind of what I'm trying to get at here as we approach the issue. And I'd be glad to use greater detail if you'd like, but let me just... All right. And then the next thing was that during her periods of depression, they continued to harass her to come in and get this videostroboscopy, which for anyone who knows people that deal with depression, getting out of bed, getting out of your house. She testified she hadn't showered for days. Getting on the phone is something extremely difficult to do, especially if you have depression so bad that you're disabled. So the bottom line, I think, when she made those religious remarks, I don't know how sincere they were or if it was just that she was frustrated. You know, she did make an indication. We aren't making a claim for religious discrimination, first and foremost. Right. But you are saying that the employer's actions were either retaliatory or their reasons for terminating her were pretextual. But you've told me enough about the religious thing, but I understand. Sure. Well, and let me just express the idea is that the videostroboscopy in the first place was not a reasonable request, and that's required. It has to relate to her essential job functions. But wait, the only... She never requested... I'm sorry. I'm sorry. If the only accommodation she ever requested was more frequent bathroom breaks, and your argument is she couldn't even get out of bed, how is she otherwise qualified for this position? Well, these were two different time frames. But she never made or requested accommodations relating to her depression other than those connected to the medication. My understanding is that she would go on leave when she needed to and return when she was able to return to work. But you say that the procedure was unreasonable because that was not an essential function of her job, but she never requested an accommodation. Is that correct? Yeah, two reasons. The first one I think you stated quite correctly, although, yeah, she didn't request an accommodation in that regard, and also... Sorry. Didn't get much sleep last night. I think also a failure to accommodate her depression only to the extent that they kept harassing her as far as going to this appointment while she was depressed. And I understand at one point that a doctor did write a note saying she could undergo the procedure, but that was prior to her last suicidal attempt. Okay. Your time is up, and you can make your points on rebuttal. My apologies. Thank you. Thank you. Good morning, Your Honors. Lori Adamczewski on behalf of the defendant at Pele Blue Cross Blue Shield of Michigan. The defendant respectfully submits that the trial court's decision to grant summary judgment with respect to all of plaintiff's claims was correct and therefore should be affirmed. Can you help us out with the factual record here? Is there a note from the psychiatrist that is dated on the 18th or 19th of January? There was a note in the psychiatrist's records dated the 18th or the 19th. However, there is no indication in the record, there's no confirmation of that actual note being sent to the defendant or its third-party administrator, Comp 1, who handles these leaves of absence. So what's in the psychiatrist's files is actually a letter addressed to Comp 1 or whoever? It's simply a form. It's a doctor's excuse note that says that she needed to be off of work dated January 19th. I think the question is, is there a transmittal document that shows that this was sent? That would be correct. That's the issue, and the answer is no. There's no record that it was ever sent or received by Comp 1 or by the defendants. Are we supposed to assume that the doctor filled it out and then just stuck it in his own file? I can't speak to what the doctor did or didn't do. I can speak to what the evidence, the undisputed evidence in the record states, and that's Comp 1 never received that note. And what's that evidence? What's that evidence? Comp 1's file, there's notes actually in the file that were cut by the case manager, Mary Kay Mitchell, that documented each and every point of contact that she had in this file, that being that she did receive that counselor's suggestion on the 17th that she not return to work at that point. However, there's no follow-up from the doctor or from the counselor sending that record to Comp 1. The idea here being defendants and a third-party administrator at Comp 1 had no knowledge or no confirmation that a leave was actually wanted. So what do they do? I mean, you've got a big company. Let's say it's not this employee, it's somebody else. You have this. They say they're going to send something. Do they just fire the person, or do they get back in touch with the person who sent that on the 17th and say, Were you going to send me something? No. What happens is the third-party administrator would handle that type of situation. In fact, Ms. Foster had multiple leaves of absence, and there are occasions in the record where they had not received that documentation from her physician in the past, and they did actually send her a letter saying, We haven't received any disabling documentation. Doesn't that cut against you? If that's what they did in the past, and that's the normal procedure, doesn't it cut against you that they jumped on the opportunity to fire her at that point? They did not jump on the opportunity to fire her. The company waited approximately two calendar weeks before she was ultimately let go. I thought she was fired on the 26th. She was. She was supposed to return on the 18th. No, but they got information on the 17th. They got information on the 17th from a counselor, and the undisputed record from the COMP 1 case administrators indicates that plaintiff had been previously informed that counselor's notes are insufficient to warrant or to validate a need for a leave of absence. But they'd previously been accepted, or at least temporarily accepted. No, they had been accepted. She had been notified that her counselor's notes were not acceptable, they were not sufficient to justify or disable her for a leave of absence. Right, but she was essentially given the leave of absence as long as she followed up later with the doctor's note. Right, and that's what exactly did not happen in this later, in this last occurrence. But the letter saying we need the doctor's note never went out from COMP 1. I believe that it did. I can't point you to something specific in the record. But the bottom line being the plaintiff knew, her doctors knew what was required of her in order to go. Well, apparently the doctor filled out the form, and the question is whether it was transmitted. It's not that they dropped the ball, in the sense that they knew that they needed it but didn't submit it. The doctor did it. The doctor filled out the form. You claim you didn't get it. The doctor, according to the doctor's file, there is a form in there. When it was filled out, why it was filled out, we don't have information as to that. However, we do have information, we have an undisputed record here, that neither defendant nor COMP 1 received that document. Okay, now why was that person not deposed? Why was whom not deposed? The person who administered Mary Kay whatever, who administered that file. Mary Kay Mitchell was identified as a potential witness by the defendants in their initial disclosures at the beginning of 2013. At no point had the plaintiff, prior to receiving a second 60-day extension, or second extension of discovery, ever requested or attempted to take her deposition. In fact, she was in communication with Ms. Mitchell, who admittedly had left COMP 1, but was coordinating with COMP 1 and COMP 1's attorney to schedule a deposition at the request of the plaintiff. However, for whatever reason, the plaintiff never followed through with scheduling that deposition prior to the judge's decision. Discovery was still open, correct? I'm sorry, what was that? Discovery was still open. Discovery was still open at that time, at the time that the motion was filed, at the time that the decision was rendered by the court. However, discovery was open at the request, and the sole request of the plaintiff in this case. Defendant objected to it. When the plaintiff requested an extension of discovery, that second extension, she didn't request that any other dates be told, or extended as well. She knew full well that the motion deadline was still intact, and that there was a potential that summary judgment could have been granted at any time after that motion. And was the court aware that there was this document in the doctor's file? I don't believe that that was part of the record that was produced by the plaintiff as part of her response to the summary judgment motion. It was or it wasn't? It was not. I do not believe that that was part of the actual record that was produced by the plaintiff in response to the motion for summary judgment. And when did she request Mitchell's dep? Mitchell's deposition was the sole reason why the plaintiff requested to extend discovery in August 2013. So the discovery was initially supposed to cut off on June, I think it was June, I want to say 13th, 2013. It was extended to August 13th, 2013 by mutual agreement of the parties. And when the August deadline had been pending, the plaintiff requested a second extension. Defendants did not concur with that during a conversation with a judge, a telephone conference with a judge. He indicated that he would agree with the extension and that was the sole reason that was identified by the plaintiffs in August as to why she needed an extended extension. When did they ask for Mitchell's dep? I believe it was around the time that discovery was closing in August was the first time that it was ever requested. Well, what happened? I'm trying to figure out what happened. They requested it when? They requested it, I believe, in early to mid-August at the time that the first extension was coming to a close. And she had her contact information through COMP1. I had also been in touch with COMP1 to communicate regarding Ms. Mitchell's whereabouts. And she had been in communication, as had COMP1's attorney, who was going to be present at Ms. Mitchell's request at this deposition, and they were working to coordinate that date around the time and probably even after the motion for summary was filed pursuant to the court's order. You're not answering my question. What happened? She notices the dep. I'm trying to find out what happened. Your guess is as good as mine, Your Honor, because I had contacted the plaintiff's attorney several times asking what's going on with this deposition. Is it going to take place? Are you noticing it up? Have you informed me of the date and time? Because maybe that just slipped through the cracks. I don't know what happened because ultimately... That's correct. I do not believe there was ever a notice. Did you ask COMP1 to get her to be present? Absolutely. Was there an informal agreement with COMP1 that you were going to voluntarily produce her? Yes. COMP1 had been in touch with Ms. Mitchell, as had I, informing her that this deposition was going to take place. Did you offer dates to the plaintiff? Yes, and I believe that the plaintiff's attorney had been, Ms. Weiermuller, the other plaintiff's attorney, had been in communication with Ms. Mitchell, the COMP1 attorney, as well as myself about potential dates for depositions. However, the plaintiff never finalized that deposition date. So it's not a matter of Ms. Mitchell being missing in action or unavailable otherwise. They had been in talks in coordinating that. For whatever reason, that the plaintiff's attorney can better explain than I, she never noticed that deposition. Okay, so you're saying it was first informally requested in the beginning of August? Is that what you're saying? That was the first time that the plaintiff's attorney ever indicated that there was a need to take Ms. Mitchell's deposition, despite the fact that she had been identified as a potential witness and the case manager by COMP1 back in April. We don't need the commentary, I'm sorry. I'm really just trying to understand for my own purposes. So there's some sort of an indication in the beginning or mid-August that she wants to take the debt, and you're saying that there's cooperation on the part of the defendants, and yes, just tell us when you want it, and that she never followed up and gave a date. That's what you're saying? That's correct. And I will also add that there was also cooperation by COMP1 and Ms. Mitchell and COMP1's attorney. Okay, and when was the motion for summary judgment? The motion for summary judgment was due on September 12, 2013. That was pursuant to the judge's scheduling order. It was filed on the 12th of September. And he ruled in November? He ruled, I believe, in the beginning of November. Okay, and during that period of time, were there continued anything that you're aware of? Not that I'm aware of. The plaintiff never contacted me and said, hey, we still need this deposition. As far as I can recall, I don't remember receiving any phone calls or emails from her saying, we're still trying to coordinate this deposition. And, in fact, I think by the time that the motion that she filed her brief in response, I don't believe that she had actually communicated with me in some time at that point regarding this deposition. So if, in fact, this is a critical document, it really just comes down to whether or not the plaintiff fulfilled their obligations to pursue the case adequately or fulfilled their obligations under 5060? I mean, I think that even if she takes that deposition, Ms. Mitchell's records from Comp 1 are still very clear that Comp 1, that Ms. Mitchell acting as the case manager for Comp 1, never received that documentation. And she had been in contact with the counselor and the doctor, because the doctor and the counselor worked in the same office. She had been in communication with them, and she had not received that documentation. I'm sorry, I just lost you. You're saying Ms. Mitchell was in communication with them? She kept a log, which was produced at discovery as part of the Comp 1 file, and it documents when she was in communication with, when she would receive things from the doctors and things of that nature. There's also, she also had, there was also other documentation regarding the fact that she had informed the plaintiff that a counselor's suggestion, that a note from a counselor would be insufficient, and the plaintiff knew that, because the plaintiff did follow up in previous instances and provide a documentation from a doctor. Okay, and then was there any evidence from somebody from the doctor's office that it was communicated? No. The plaintiff could, and this is another example, the plaintiff could have deposed someone from the doctor's office. The plaintiff could have had an affidavit signed from someone from the doctor's office. None of that was presented in the record here. The undisputed record here ultimately reveals simply that the defendants were not aware that the plaintiff was needing to take an initial leave of absence. It also bears, it's just completely contradictory of the past record, where she was afforded three other leaves of absence for depression within the preceding year. Why would they discriminate or retaliate or harass her at this point when she's, if she's clearly in need of it, they've been accommodating it, they've been giving her those leaves of absence to settle on? But doesn't that argument cut against you? If the practice is to give her the leaves to accept a temporary psych therapist note, await the doctor, if you don't get the doctor, you get back in touch, you go, hey, where's the note, whatever, that's been going on all of this time until she complains about this statement. And then all of a sudden everything changes. The complaint that she's referring to occurred in June 2011. She never made subsequent, there was a complaint in December that renewed the same concerns that were investigated by the defendant's HR department during the course of June, July, August, and September of 2011. All the while, she's being accommodated with the bathroom breaks, with leaves of absence for her depression. There's no indication that she's raised any new complaints, nor did she raise any new complaints relating to any allegations that she was harassed or retaliated against because of a disability. And in fact, the plaintiff never actually testified that, when she was given multiple opportunities to testify about what she believed, how she believed she was retaliated against, and what she believed were the causes of any discrimination or harassment. She never identified any disability as part of that. Rather, she relied solely on these alleged comments by Farron Gibson that were made back in October of 2010 that she didn't complain about until June of 2011. There was an investigation that took several months, in part because they were waiting for Ms. Burdett Foster to return from a leave of absence so that they can conclude the investigation and do a follow-up with her. They found no evidence of any improper wrongdoing, and in fact, they found that Ms. I'm sorry. Were they investigating his comment, or were they investigating her being followed? They investigated both Mr. Gibson and Mr. Walgenbach, who she's alleging was following her. And they found no evidence of that. In fact, the investigation report, which it was part of the record, and I apologize, I don't have that reference in front of me, did reveal that Mr. Walgenbach actually shied away from confrontations with Ms. Burdett Foster. So he wasn't trying to confront her. He wasn't doing anything to raise a confrontation with her. The fact of the matter is they sat side by side in two cubicles separated by a wall. So if they were going back and forth to a restroom or to the kitchen, it was coincidental at best. So just to sum up quickly, I know my time is up. We respectfully request that the court uphold the lower court's decision granting the motion for summary judgment. If the judges have no further questions for me, I conclude. Thank you. Thank you very much. Thank you, Your Honors. Counsel, I know you only have three minutes, but in your rebuttal, could you at some point just tell us, in the most focused way you can, what is the genuine issue of material fact in this case that makes summary judgment inappropriate? Okay. I would say, and there was a perfect example just then, was Mr. Walgenbach harassing my client according to what he testified to? No. According to my client, he's following her around everywhere she goes, standing outside the bathroom when she gets there. I think that would make any of us nervous on a daily basis at work. You've got another manager who's pushing doors out of you, who's sticking their elbow out of you as you're walking by, so you have to avoid getting physically assaulted. That's her version of events. His may be different, but her testimony is evidence, and that evidence has to be considered and taken into account. It can't be just brushed under the rug because a judge, whether he intended to or not, in my opinion, made a credibility determination on that issue. Thank you. You're welcome. I hope that was succinct on that. And then I did briefly want to address, although I don't think it's a key issue in this case, why Mary Kay Mitchell was not deposed because there was quite a bit of discussion on that. It was not as easy as it sounds. She left Comp 1. She got her own attorney and or Comp 1 got an attorney for her at some point, and this may be after Ms. Weiermuller spoke with opposing counsel. I'm not sure. But my understanding of the situation was we were working with this other attorney, specifically the attorney for Ms. Mitchell, attempting to get dates. They wouldn't get back to us. I forget if we, I believe at the time that the motion was filed, we were getting ready to send out a subpoena for her deposition, and there was also one other, well, I'll skip that and get to my. There were changes between the time the motion was filed and when the summer judgment was granted. So why didn't you send out the subpoena? Well, my understanding was up until the point that we realized we weren't going to have oral argument, I think then we realized it was going to be what it was going to be. Maybe we could have submitted a supplemental brief at that point. That has nothing to do with whether you, there was no stopping your discovery just because the motion was pending, right? Okay. There was no stay of discovery. Right, there was no stay of discovery. So why didn't you go ahead and subpoena? Well, and that's the thing I can't say about that one way or the other is Ms. Weiermuller was handling that, and I'm sorry that I didn't ask before I came. If it's of great importance, of course, we'd be happy to file something supplemental. But why can't you just answer the question? The question is why didn't you go ahead and notice the deposition and trigger that process? That doesn't require a supplemental brief. That's saying why didn't it happen on your end? Well, we didn't have any agreement as to when it could be. That's what I'm saying. She had her own attorney. Forget any communications with Blue Cross. What happened was they weren't communicating with us at Comp 1 at all. So simply by not agreeing, you could allow somebody else to just thwart your ability to pursue and prosecute your client's case? Right, but at the point that the motion was filed, my understanding was that things were still in limbo. And unfortunately, because Deborah was handling the discovery aspects, I can't speak as to exactly where they stood other than what I've told you already. But you never submitted anything from the doctor's office saying that this was faxed? Correct, correct. And that was totally within your control, right? Yes. And I assume that you got the records from, what's it, Comp 1? Yes, we did finally receive the records from Comp 1. When did you receive those? Again, that would have been discovery was more her bailiwick. Opposing counsel may be able to speak to it. I don't know. But my understanding was they were subpoenaed at one point, and I believe it was somewhere. You knew that that form was not in their records, right?  You got the records. I would have anyway. I get what you're saying. So you get the records. The form's not there. And I would think that, I mean, it's a big issue. At least to me it is, because on the one hand, you have them saying, the bottom line for them is she was fired because she was absent without any explanation. So that would seem to be the big question. I believe that's an important question, certainly. I do believe that the past practice of allowing her psychological notes to go through from the psychologist, again, sometimes they'd let that go for several weeks up until the end of a disability before they took a look at the MD note. In this case, it's drafted the 19th. Whether or not they received it, I don't know that at this point in time. But I would say that based on their past practice, my client at least had some right to rely on that. And especially given the nature of her disability, debilitating depression, anybody who knows anything about it, it's extremely difficult. If I may just real briefly summarize. Okay. I think the main issue here was that there was a credibility determination and a failure to view the evidence in the light most favorable to Shamelia. There were genuine issues of material fact as to each count. While some juror might agree with the judge that Shamelia was not to be believed that she was on disability leave at the time she was fired, there is evidence of the true prior incidents and certainly a jury could find other than the judge did. I'll leave it at that for now. Thank you for your time. Thank you both.